**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DONALD DAMRON, ) | |
| ) | CASE NO.  5:14CV2372 |
| Plaintiff, ) | |
| ) | |
| v. ) | JUDGE DONALD C. NUGENT |
| ) | |
| ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security ) | **REPORT & RECOMMENDATION** |
| ) | |
| Defendant. ) | |

Plaintiff Donald Damron ("Damron") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying his claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be VACATED and the case REMANDED.

**I.  Procedural History**

In August 2011, Damron filed applications for POD, DIB, and SSI, alleging a disability onset date of September 15, 2010 and claiming he was disabled due to diabetes type II and degenerative arthritis.  (Tr. 154, 156, 176.)  His application was denied both initially and upon reconsideration.  (Tr. 121-127, 134-146.)

On June 20, 2013, an Administrative Law Judge ("ALJ") held a hearing during which Damron, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 47-

80.) On July 19, 2013, the ALJ found Damron was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. (Tr. 13-20.) The ALJ's decision became final when the Appeals Council denied further review. (Tr. 1-3.)

## II. Evidence

*Personal and Vocational Evidence*

Age fifty-three (53) at the time of his administrative hearing, Damron is a "person closely approaching advanced age" under social security regulations. *See* 20 C.F.R. § 404.1563(d) & 416.963(d). He has a high school education and past relevant work as a press operator (semi-skilled, SVP 3, medium); production assembler (unskilled, SVP 2, performed as heavy); and, painter and/or construction helper (unskilled, SVP 2, performed as heavy). (Tr. 54, 69-70.)

*Relevant Medical Evidence*

In February 2006, Damron presented to a chiropractor[1] with complaints of constant neck pain and shooting pain in his left upper arm. (Tr. 301.) Examination was positive for left foramina compression and pain, as well as left shoulder depression and pain, indicative of nerve root compression. *Id*.

On March 27, 2008, Damron presented to chiropractor Charles Moore, D.C., with complaints of (1) neck pain radiating into his left arm; (2) tingling in his left hand; (3) occasional headaches; and, (4) "limited rotation." (Tr. 300.) Dr. Moore's examination notes indicate decreased range of motion in Damron's extension, left lateral flexion, left rotation, and right rotation. *Id*. Dr. Moore also noted pain to palpation and muscle spasms in Damron's neck and shoulder regions. *Id*. On April 3, 2008, Dr. Moore completed a roentgenological report, which noted subluxations at C7; "severely decreased lordotic curve apexing at 4;" and, narrowed disc space between C5 and C6. (Tr. 297.)

The record reflects Damron presented for chiropractic treatment on March 28, March 31, April 3, April 7, April 10, April 14, April 17, April 21, and April 25, 2008. (Tr. 293-295.) At these visits, he generally reported moderate neck and thoracic pain, as well as left arm pain

---

[1] The chiropractor's signature is illegible.

and/or numbness. *Id*. Examination notes indicate decreased range of motion/subluxation in the cervical spine. *Id*.

The next treatment note in the record is dated January 20, 2011. (Tr. 251-252.) On that date, Damron presented to Ranjit Singh, M.D., at the Open M Free Clinic. *Id.* Damron reported that, two months previously, he "was helping someone move and since then cannot lift [his] arm above [his] shoulders." (Tr. 252.) He also complained of pain in his biceps and left shoulder region. *Id.* Dr. Singh assessed right posterior shoulder pain radiating to triceps, and tenosynovitis. *Id.* He prescribed a sling, Kenolog, and Ibuprofen 800 mg.[2] *Id.*

Damron returned to the Free Clinic on April 21, 2011. (Tr. 249-250.) At this time, he reported "doing well" but stated his "biggest problem" was pain and limitation of motion in his right shoulder. (Tr. 250.) The attending physician referred Damron to the orthopedic clinic and ordered an x-ray. *Id.* Damron underwent an x-ray of his right shoulder on May 5, 2011. (Tr. 259.) It showed as follows: "Abnormal bone mineralization of the humeral head, glenoid and acromion, of concern for permeative marrow process. Neoplasm is not excluded." *Id.* Damron returned to the Free Clinic on May 26, 2011, at which time he received a steroid injection from Barry J. Greenberg, M.D. (Tr. 248.) Dr. Greenberg also referred Damron for an MRI of his right shoulder "to exclude neoplasm." *Id.*

Damron underwent a right shoulder MRI on July 15, 2011. (Tr. 253-254.) This MRI revealed (1) tendinopathy involving the posterior aspect of the supraspinatus and anterior aspect of the infraspinatus tendons; (2) abnormal signal within the superior labrum likely representing a tear; and, (3) moderate hypertrophic degenerative arthritis acromioclavicular joint. (Tr. 254.) On July 21, 2011, Roger B. Chaffee, M.D., reviewed Damron's MRI and diagnosed hypertrophic degenerative arthritis in the acromioclavicular joint, along with a tear in the superior labrum. (Tr. 243.) He also noted there was "no discrete rotator cuff tear and there is no evidence of a neoplasm." *Id.*

---

[2] Dr. Singh's treatment note also reflects that, at this time, Damron was taking Metformin for his diabetes and Simvastatin. (Tr. 252.)

Damron returned to the Free Clinic on August 25, 2011 with complaints of right shoulder pain and stiffness. (Tr. 245-246.) Dr. Greenberg administered another steroid injection and referred Damron to an orthopedist. (Tr. 246.) On October 15, 2011, Damron presented to the Free Clinic for treatment of his right shoulder pain, and numbness and tingling in his left thumb. (Tr. 244.) The attending physician assessed Dupuytren's contracture[3] (more severe in the left hand) and tendonitis of the right shoulder. *Id.* Damron was advised to continue with physical therapy. *Id.*

On October 11, 2011, Damron underwent a consultative examination with Yolanda Duncan, M.D. (Tr. 233-239.) During this exam, Damron reported "some weakness in his right arm and when he grabs things, his arm will shake, but he is able to hold things." (Tr. 233.) He also stated that he can sit "without a problem," stand for 1-2 hours and then has lower back pain, can walk for almost 1 mile and then has leg pain; and, can climb 1 flight of stairs. *Id.* On examination, Dr. Duncan observed Damron had a normal gait and "no use of ambulatory aids." (Tr. 234.) She found decreased motion of the right shoulder, stating "[t]he patient is only able to lift it about 60 degrees." *Id.* Additionally, Dr. Duncan reported that Damron "did not have difficulty grasping or manipulating objects with either hand." *Id.* She assessed diabetes, hypertension, hypocholesterolemia, and right rotator cuff tear. (Tr. 234-235.) Based on her examination, Dr. Duncan concluded Damron "should not have difficulty with work-related physical activities such as sitting, standing for 1-2 hours, walking up to 1 mile, and climbing 1 flight of stairs." (Tr. 235.)

Shortly thereafter, on October 18, 2011, state agency physician Leslie Green, M.D., reviewed Damron's records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 85-87.) Therein, she concluded Damron could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8 hour workday; and, sit about 6 hours in an 8 hour workday. (Tr. 85-86.) Dr. Green further found Damron had

---

[3]Dupuytren's contracture has been defined as "shortening, thickening, and fibrosis of the palmar fascia, producing a flexion deformity of a finger." Dorland's Illustrated Medical Dictionary (30th ed.).

limited push/pull capacity in his right upper extremity due to decreased shoulder strength and the fact that he "cannot reach farther than 60 degree with [right upper extremity]." (Tr. 86.)  She also offered that Damron could never climb ladders/ropes/scaffolds, and could only occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. *Id*.  Dr. Green further opined Damron had limited overhead, front, and lateral reaching with his right upper extremity, but unlimited handling and fingering. *Id*.  By way of explanation, Dr. Green stated Damron had decreased use of his right shoulder "limited to occasional." (Tr. 87.)  Finally, Dr. Green explicitly found that "minimal weight" should be given to Dr. Duncan's opinion "as there is no support for limiting standing to 1-2 hours."[4]  *Id.*

Damron returned to the Free Clinic on December 15, 2011 with complaints of increased pain in his right shoulder; decreased range of motion in his left hand; and numbness in his left fingers. (Tr. 242.)  Several months later, in March 2012, Damron presented to Carole Savan, M.D., of the Free Clinic with complaints of pain in his left shoulder radiating to his elbow. (Tr. 274.)  Dr. Savan assessed tendonitis and referred Damron for an orthopedic consultation. *Id*.

On June 14, 2012, Damron presented to the Free Clinic with continued complaints of left shoulder pain radiating to his elbow. (Tr. 273.)  The attending physician assessed Dupuytren's contracture and tendonitis of the left shoulder. *Id*.  Damron was referred for physiotherapy and prescripted Ibuprofen 800 mg and Omeprazole. *Id.*  Damron returned to the Free Clinic in September 2012 with similar complaints and was referred to Dr. Greenberg for a steroid injection. (Tr. 272.)

In December 2012, Damron presented to Dr. Chaffee with complaints of left shoulder pain with lifting. (Tr. 271.)  Dr. Chaffee noted a previous diagnosis of tendonitis, and referred Damron to Dr. Green "for possible additional steroid injections and assessment of [Dupuytren's] contracture." *Id*.  Damron presented to Dr. Greenberg on February 28, 2013, who referred him

---

[4] On January 25, 2012, state agency physician William Bolz, M.D., reviewed Damron's records and completed a Physical RFC Assessment. (Tr. 105-107.)  He affirmed Dr. Green's conclusions in all respects. *Id.*

5

for an orthopedic consultation regarding his contractures. (Tr. 270.) The following month, on March 7, 2013, Damron returned to Dr. Chaffee for a follow-up appointment. (Tr. 269.) Dr. Chaffee noted Damron's Dupuytren's contractures and referred him for an orthopedic consultation. *Id.*

On June 6, 2013, Dr. Chaffee completed a "Diabetes Mellitus Residual Functional Capacity Questionnaire." (Tr. 287-290.) Therein, Dr. Chaffee noted diagnoses of diabetes mellitus, hyperlipidemia, and hypertension. (Tr. 287.) He also referenced loss of manual dexterity in Damron's left upper extremity, clinical findings of "ongoing" left shoulder pain, and left upper extremity pain "evident and limiting." (Tr. 287, 290.) Dr. Chaffee found Damron could lift and carry less than 10 pounds occasionally, with the term "occasionally" defined as less than 1/3 of an average eight hour workday. (Tr. 289.) He stated Damron could walk two to three city blocks without rest or severe pain; continuously sit and stand for one hour each at one time; and, sit and stand/walk for about four hours each total in an eight hour workday (with normal breaks). *Id.* He further opined Damron would need a job that permits shifting positions at will from sitting, standing or walking. *Id.* Dr. Chaffee stated Damron would need periods of walking around during an eight hour workday, and stated specifically that Damron would need to walk for a period of eight minutes every 20 minutes. *Id.* Finally, Dr. Chaffee found Damron would need to elevate his legs to lap level with prolonged sitting, but did not opine the percentage of time during an eight hour workday that Damron would need to do so. *Id.*

With regard to Damron's manipulative abilities, Dr. Chaffee concluded Damron had "significant limitation in doing repetitive reaching, handling or fingering." (Tr. 288.) Specifically, Dr. Chaffee offered the following estimates of the percentage of time during an eight hour workday on a competitive job that Damron could use his hands/fingers/arms for the following repetitive activities:

6

|  | **HANDS: Grasp, Turn, Twist Objects** | **FINGERS: Fine Manipulation** | **ARMS: Reaching (Including Overhead)** |
|---|---|---|---|
| **Right** | 75% | 75% | 70% |
| **Left** | 5% | 5% | 5% |

*Id*.  Dr. Chaffee further opined Damron could stoop 10% of an 8 hour workday and crouch 10% of an 8 hour workday.  *Id*.

Dr. Chaffee found Damron should avoid concentrated exposure to extreme cold and heat; soldering fluxes, perfumes, fumes, odors, dusts, and gases; and, should avoid moderate exposure to high humidity, chemicals, and solvents/cleaners.  *Id*.  Finally, Dr. Chaffee concluded Damron's impairments were likely to produce "good days" and "bad days" and that Damron was likely to be absent from work "about four times a month" as a result of his impairments or treatment.  *Id.*

*Hearing Testimony*

During the June 20, 2013 hearing, Damron testified as follows:

- He completed high school.  (Tr. 54.)  He lives with his fiancee.  (Tr. 64.)

- In the past, he worked as a laborer.  He "ran machines" and painted.  In this job, he was on his feet most of the day and lifted approximately 50 pounds.  (Tr. 55.)  He also worked for many years as a press operator.  He assembled fittings with his hands and "stamped out parts."  (Tr. 56-57.)  He has not worked since September 2010.  (Tr. 54.)

- His main problems are with his shoulders, arms, and hands.  (Tr. 58-59.)  He cannot lift either arm over his head.  He can, however, reach in front and to the side with both arms.  (Tr. 59-60.)  He has Dupuytren's contractures in both hands, which affect his middle fingers bilaterally.  (Tr. 60-61.)  He does not have loss of sensation or difficulty holding things with his right hand; however, it is harder for him to do "the little things" like button his shirt or pick things up.  (Tr. 61-62.)  His left hand is worse than his right.  (Tr. 62.)  His left hand is weaker than it used to be, making it difficult for him to lift or hold on to things.  *Id.*  Additionally, he has lost his sense of touch in his left hand, explaining that the "feeling is pretty much gone, it's cold at all times."  Basically, his ability to do "little things" with his fingers is "just gone." (Tr. 63.)

- He also experiences daily back pain.  (Tr. 59, 63-64.)  He can stand for an hour or two, but then has pain in his lower back.  (Tr. 63.)  He can walk, but he begins to experience pain in his back that radiates down his leg.  *Id.*  He can sit for an hour or two, but he starts to get "fidgety."  *Id.*

- His conditions prevent him from working because he has reduced strength and

7

> "no lifting ability anymore." (Tr. 58.) He also cannot work because he is unable to hold anything with his left hand. *Id*. For example, he cannot hold a gallon of milk. *Id.*

- His conditions prevent him from sleeping well. He has difficulty laying on his side, and can only sleep for three hours per night. (Tr. 63-64.)

- His fiancee does the cooking. (Tr. 64.) He does as much laundry as he can, and helps his fiancee with the grocery shopping. (Tr. 64.) He has difficulty mowing the lawn. (Tr. 62.) On a typical day, he walks in the morning and tries to exercise. (Tr. 65.) He goes outside "quite a bit," often visiting his mother. *Id*. He walks his dog every day. *Id.* He tries to keep busy. He reads and watches television. *Id.*

- He has not had medical insurance since 2008. (Tr. 65.) He takes prescription ibuprofen for his pain. (Tr. 66.) He does not take prescription pain medication because the free clinic is not permitted to prescribe it. *Id*. His diabetes is under control. *Id.* He was recently referred to an orthopedic surgeon clinic for consultation regarding his hands. (Tr. 79.) Four different surgeons looked at his hands and indicated they would not perform surgery because of the risk of nerve damage and infection. *Id*. He indicated that he would have to live with this condition the rest of his life. *Id.*

The VE testified Damron had past relevant work as a press operator (semi-skilled, SVP 3, medium); production assembler (unskilled, SVP 2, performed as heavy); and, painter and/or construction helper (unskilled, SVP 2, performed as heavy). (Tr. 69-70.) The ALJ then posed the following hypothetical:

> I would like you to assume a person closely approaching advanced age with a high school education and the claimant's work history, can perform light work. Assume this person cannot lift or carry more than ten pounds. Assume this person can never climb ladders, ropes or scaffolds, but can occasionally climb stairs. Assume this person can occasionally stoop, kneel, crouch and crawl. Assume this person cannot reach overhead with either upper extremity. Could this person perform any of the claimant's past work?

(Tr. 70-71.) The VE testified such an individual could not perform Damron's past relevant work, but could perform the representative occupations of cafeteria cashier (unskilled, SVP 2, light); recreation aide (unskilled, SVP 2, light); and, usher (unskilled, SVP 2, light). (Tr. 72-73.) The VE did note, however, that "reduction from lifting a maximum of 20 to 10 pounds does, you know, significantly limit the number of jobs at light in my opinion." (Tr. 73.)

The ALJ then posed a second hypothetical, as follows:

> Hypothetical Number 2, assume the individual described in Hypothetical Number 1 can frequently perform fine and gross manipulation bilaterally, finger and handling is what I'm talking about. Are there jobs this person could perform?

8

(Tr. 73-74.) The VE testified such an individual "could still do all three of the [previously identified] occupations with no further reduction in the number of jobs." (Tr. 74.) The ALJ then modified the above hypothetical to restrict the individual to occasional bilateral fine manipulation (i.e., fingering), but still frequent bilateral handling. *Id*. The VE testified this additional restriction would eliminate the cafeteria cashier position, but would not affect the recreation aide or usher jobs. *Id*.

Damron's attorney then asked the VE "if I were to adopt His Honor's first hypothetical, but further reduce [the] individual to lifting less than ten pounds occasionally, how would that affect the job as you identified?" (Tr. 75.) The VE testified the recreation aide and usher jobs would not be affected by this additional restriction, but the number of cafeteria cashier jobs would be reduced by "no more than 10 percent." *Id*. Damron's attorney then asked whether the identified jobs would be affected if the ALJ's first hypothetical included the additional limitation that the individual was limited to standing and/or walking for only four out of eight hours. (Tr. 75.) The VE testified the cafeteria cashier job would not be affected, but the recreation aide and usher jobs would be eliminated. (Tr. 75-76.)

Damron's attorney then asked the VE the following:

Q: And as far as His Honor's third hypothetical, it was my understanding – I think it was occasional fingering bilaterally but still frequent handling, is that correct?

A: That is correct.

Q: So, if I were to further reduce that to occasional handling bilaterally, would that affect either the usher or the recreational aide position?

A: Yeah. That would eliminate the recreation aide. And I think, at most instances, it would not eliminate the ushering positions according to the DOT. But I think reasonably in my experience, it would likely eliminate that occupation, too. Just so that I'm clear, the DOT characterizes usher jobs as only requiring occasionally handling, but I think it is more reasonable than not that there would be periods of time where an individual might be expected to hold or handle something in excess of a third of a workday, and at other times, it may be much less than that.

The DOT, I'm sure, was probably taking an average or most frequently occurring mode in terms of occurrence, but I think probably more reasonable than not, based upon my experience, we completely eliminate that occupation.

9

> Q: And one last question, Mr. Joy, if I were to, again, adopt his Honor's first hypothetical, limit the right side to frequent fine and gross, but as far as the left side, it would be restricted to handling and fingering five [percent] of the day, would that affect the three jobs you identified at all?
>
> A: Yeah, it's going to eliminate the cafeteria cashiering position because that job does require bilateral hand use. And, essentially, five percent, you're almost to the point where there's no significant left-hand use at all.
>
> Q: Right.
>
> A: The ushering position, I think is probably more reasonable than not, that the job still could probably be done, whether that– there's not a lot of occasions where somebody who is right-hand dominant would – you know, couldn't do the same type of handling with the opposite hand, so I don't think that that would significantly limit the job.
> The recreation aide, I think that would require bilateral hand use, and would reasonably eliminate that occupation based upon that hypothetical.

(Tr. 76-77.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[5]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

---

[5] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Damron was insured on his alleged disability onset date, September 15, 2010, and remained insured through the date of the ALJ's decision, July 19, 2013. (Tr. 13.) Therefore, in order to be entitled to POD and DIB, Damron must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ found Damron established medically determinable, severe impairments, due to degenerative joint disease of the right shoulder, tear of the superior labrum of the right shoulder, degenerative joint disease of the left shoulder, and Dupuytren's contracture; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 15- 16.) Damron was found incapable of performing his past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. (Tr. 16-19.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Damron was not disabled. (Tr. 18-19.)

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant

11

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.

Ohio July 9, 2010).

## VI.  Analysis

### *Treating Physician Dr. Chaffee*

Damron argues the ALJ failed to properly analyze the opinion of treating physician Dr. Chaffee.  He maintains that, although the ALJ purported to accord weight to Dr. Chaffee's opinion regarding Damron's fine and gross manipulation limitations, the decision failed to incorporate the specific manipulative limitations assessed by Dr. Chaffee regarding Damron's left upper extremity.  Specifically, Damron notes that Dr. Chaffee concluded Damron's left upper extremity could be used in a competitive work setting for only five percent of an eight hour workday for grasping, fingering, and reaching.  (Tr. 288.)  While the ALJ's assessment of Dr. Chaffee's opinion states that "[d]iagnostic test results and clinical observations support a finding that the claimant has limitations with fine and gross manipulation as well as lifting and carrying," the decision nevertheless fails to discuss the 5% left upper extremity restriction or include it in the RFC.  Damron maintains the ALJ fails to give good reasons for discounting this limitation and, further, that this error is not harmless given the VE's testimony that such a restriction would eliminate two of the three identified jobs.  (Doc. No. 13.)

The Commissioner argues that the ALJ "appropriately evaluated the opinion of Dr. Chaffee and gave good reasons for the weight he afforded it."  (Doc. No. 14.)  She cites evidence supporting the ALJ's rejection of Dr. Chaffee's opinions regarding Damron's sitting, standing, walking limitations, and emphasizes Damron's hearing testimony that his typical day includes walking and exercising.  *Id.* at 6.  In addition, the Commissioner asserts that "even if the ALJ adopted Dr. Chaffee's five percent limitation, the VE testified that the usher job would remain," leaving 21,000 jobs in the national economy.  *Id.* at 7.  Thus, the Commissioner asserts "the ALJ provided reasons for rejecting the treating source opinion and there was simply no support for the extreme limitations provided by Dr. Chaffee."  *Id*. at 8.

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence

13

in [the] case record." *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[6]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion

---

[6] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

"denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, the ALJ recognized Damron suffered from the severe impairments of degenerative joint disease of the left and right shoulders; tear of the superior labrum of the right shoulder; and, Dupuytren's contracture. (Tr. 15.) The decision recounted Damron's self-reported limitations, noting his testimony that he is unable to work due to pain and weakness in his upper extremities. (Tr. 16.) However, the decision contains only a cursory discussion of the medical evidence of record regarding his impairments, consisting of no more than three short paragraphs. (Tr. 17.) The ALJ concluded Damron's medically determinable impairments could reasonably be expected to cause his alleged symptoms; however, his statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely credible." *Id.* In making this finding, the ALJ noted Damron's conservative treatment history and emphasized that Damron "takes only ibuprofen for pain." *Id.*

The ALJ then evaluated the opinion evidence.  With regard to consultative examiner Dr. Duncan, the ALJ gave "some weight" to this opinion.  The ALJ agreed with Dr. Duncan that Damron would not have difficulty sitting, walking 1 mile, and climbing 1 flight of stairs but found "there is no objective medical evidence in the record that supports [Dr. Duncan's] opinion that the claimant would only be able to stand from 1-2 hours."  (Tr. 17.)  As for state agency physicians Dr. Green and Dr. Bolz, the ALJ gave "significant weight" to these opinions "because they are consistent with the diagnostic evidence and the clinical observations of Dr. Duncan and the Open M Free Clinic."  (Tr. 18.)  The ALJ weighed Dr. Chaffee's opinion as follows:

> On June 6, 2013, treating physician Dr. Roger Chaffee completed a "diabetes mellitus residual functional capacity questionnaire."  Dr. Chaffee opined that the claimant has significant limitations in handling and fingering, is only able to stoop and crouch 10% of a workday, would miss work 4 days each month due to illness or medical treatment, is only able to sit for 4 hours in an 8-hour workday, stand/walk for 4 hours in an 8-hour workday and occasionally lift less than 10 pounds.  He also opined that claimant would require an at-will sit/stand option and time to walk around if needed.  I give only some weight to Dr. Chafee's [sic] opinions.  Diagnostic test results and clinical observations support a finding that the claimant has limitations with fine and gross manipulation as well as lifting and carrying.  However, there is no medical evidence to support the opinion that the claimant has difficulty sitting, standing or walking for 6-8 hours in an 8-hour workday.  (Exhibit 6F).

(Tr. 17-18.)

The Court finds the ALJ failed to properly analyze Dr. Chaffee's opinion.[7]  The ALJ recognized Damron suffered from severe impairments relating to his bilateral shoulders and hands. (Tr. 15.)  Moreover, the ALJ specifically acknowledged that Dr. Chaffee assessed "significant limitations in handling and fingering" and, further, that "[d]iagnostic test results and clinical observations support a finding that the claimant has limitations with fine and gross manipulation as well as lifting and carrying."  (Tr. 17.)  However, the decision failed to acknowledge Dr. Chaffee's specific opinion that Damron's use of his left upper extremity for grasping, fingering, and reaching would be limited to five percent of an eight hour workday.  (Tr. 288.)

---

[7] The Court notes that the Commissioner does not challenge Dr. Chaffee's treating physician status herein.

16

While the decision does not address this particular opinion, the Court finds the ALJ implicitly rejected it.  As noted above, the RFC clearly restricts Damron to frequent bilateral fine and gross manipulation (i.e., fingering and handling).  In the social security context, the term "frequent" means between 1/3 to 2/3 of a workday.  *See Kolasa v. Comm'r of Soc. Sec.,* 2015 WL 1119953 at * 9 (E.D. Mich. March 11, 2015) (stating that the term "frequently" is defined as "activity or condition [that] exists 1/3 to 2/3 of the time"); *Ferguson v. Comm'r of Soc. Sec.*, 2013 WL 941552 at * 7 (S.D. Ohio March 8, 2013) (same).  Thus, while purporting to accept and accord weight to Dr. Chaffee's opinion regarding Damron's fingering and handling limitations, the Court finds the ALJ implicitly rejected Dr. Chaffee's 5% left upper extremity restriction by incorporating frequent bilateral fine and gross manipulation into the RFC.  As Damron correctly notes, the ALJ's failure to address this opinion is significant because the VE expressly found that two of the three identified jobs (i.e., cafeteria cashier and recreation aide) would be eliminated by Dr. Chaffee's 5% limitation.

The Commissioner suggests that the decision is nonetheless supported by substantial evidence because, even if the ALJ adopted Dr. Chaffee's 5% limitation, the VE testified that the usher job would remain, leaving 400 jobs in the northeast Ohio region and 21,000 jobs in the national economy.  (Doc. No. 14 at 7.)  The Sixth Circuit has held that, in some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion may be considered "harmless error.  These circumstances are present where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) - the provision of the procedural safeguard of reasons - even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547.  *See also Cole v. Astrue,* 661 F.3d 931, 940 (6th Cir. 2011); *Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. Appx. 456, 464 (6th Cir. 2005).  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via

17

an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. *See Nelson*, 195 Fed. Appx. at 470-471 (6th Cir. 2006); *Hall,* 148 Fed. Appx. at 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec*., 375 Fed. Appx. 543, 551 (6th Cir. 2010). In other words, "[i]f the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend*, 375 Fed. Appx. at 551.

Here, the Commissioner does not clearly assert that any of the three circumstances noted above are present in the instant case. Rather, the Commissioner implies that the ALJ's failure to address Dr. Chaffee's 5% limitation opinion is harmless because the VE testified that, even with this limitation, there would be sufficient usher jobs available to preclude a finding of disability. However, the Commissioner has not cited any authority suggesting that an ALJ's failure to follow the "good reasons" rule may be excused in light of VE testimony that sufficient jobs are otherwise available.[8] To the contrary, the holdings of the Sixth Circuit seem to suggest otherwise. *See e.g, Wilson*, 378 F.3d at 546 ("A court cannot excuse the denial of a mandatory procedural protection simply because . . . there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely").

Moreover, none of the three circumstances identified by the Sixth Circuit as warranting relief under the "harmless error" exception to the "good reasons" rule appear to be applicable herein. First, the Commissioner has not suggested, and the Court does not find, that Dr. Chaffee's assessment of Damron's left upper extremity restrictions is "so patently deficient that

---

[8] The Commissioner cites *Nejat v. Comm'r of Soc. Sec*., 359 Fed. Appx. 574 (6th Cir. 2009) in support of her argument that the decision should be affirmed because, even with Dr. Chaffee's 5% limitation, the VE testified that 21,000 usher jobs would remain. The Court finds *Nejat* to be distinguishable. In that case, the Sixth Circuit did not find that an ALJ's failure to articulate good reasons for rejecting a treating physician opinion could be excused as harmless error in light of VE testimony indicating that sufficient jobs would be available had the treating physician's opinion been adopted. To the contrary, in *Nejat*, the Sixth Circuit found that the ALJ did, in fact, articulate good reasons for rejecting the treating physician's standing/walking restrictions. *Id.* at \* 578. The issue of sufficiency of the number of jobs identified by the VE was addressed by the Sixth Circuit solely in the context of resolving a challenge to the ALJ's analysis at step five of the sequential evaluation process. *Id*. at \* 578-579.

18

the Commissioner could not credit it." *Wilson*, 378 F.3d at 547.  To the contrary, the decision itself acknowledges that diagnostic test results and clinical observations support a finding that Damron has limitations with fine and gross manipulation.  (Tr. 17.)  Moreover, the second circumstance is not present because, as discussed above, the ALJ clearly did not adopt Dr. Chaffee's opinion with regard to Damron's 5% limitation in his left upper extremity or otherwise make findings consistent with that opinion.

Finally, the Court is not persuaded that "the Commissioner has met the goal of § 1527(d) - the provision of the procedural safeguard of reasons - even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547.  The decision does not thoroughly discuss the many treatment notes in the record addressing Damron's left upper extremity pain and weakness, nor does the decision's analysis of the other evidence of record shed any light on the ALJ's reasons for discounting Dr. Chaffee's opinion regarding Damron's severe left upper extremity restrictions.  In sum, the ALJ's failure to provide an analysis of Dr. Chaffee's opinion deprives the Court of the opportunity to conduct meaningful judicial review.  The Court is unable to trace the path of the ALJ's reasoning as his analysis was insufficient under the Administration's procedural rules.

Accordingly, the Court finds the ALJ erred in failing to address Dr. Chaffee's opinion that Damron's use of his left upper extremity for grasping, fingering, and reaching would be limited to five percent of an eight hour workday and, further, that this failure was not "harmless error."  Although there may be good reasons to reject Dr. Chaffee's opinion, the ALJ is required to articulate those reasons in order to allow meaningful appellate review.  Because the ALJ failed to do so here, the decision should be vacated and this matter remanded for further consideration of Dr. Chaffee's opinion.

In the interest of judicial economy, the Court will not address Damron's second assignment of error, in which he maintains that "substantial evidence does not support the RFC finding because it failed to accurately describe Plaintiff's abilities in several respects."  (Doc. No. 13 at 10.)  In the event of a remand, the ALJ should consider the opinions of state agency physicians Dr. Green and Dr. Bolz that Damron was limited to occasional front and lateral

reaching with his right upper extremity. (Tr. 86, 105-107.)

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence. Accordingly, the decision should be VACATED and the case REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

s/ Greg White<br>United States Magistrate Judge

Date: September 3, 2015

**OBJECTIONS**
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters***, 638 F.2d 947 (6th Cir. 1981).** *See also Thomas v. Arn***, 474 U.S. 140 (1985),** *reh'g denied***, 474 U.S. 1111 (1986).**